**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| **MARCUS HURDLE**, | No. 3:20-cv-605-KAD |
| *Petitioner*, | |
| v. | May 7, 2020 |
| **ROLLIN COOK**, Commissioner, Connecticut Department of Correction, and **KENNETH BUTRICKS**, Warden, Cheshire Correctional Institution, | **AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND REQUEST FOR EMERGENCY ADMISSION TO BAIL / ENLARGEMENT** |
| *Respondents*. | |

## PRELIMINARY STATEMENT

1.      Petitioner Marcus Hurdle is a 51-year-old disabled veteran who suffers from serious mental and physical health conditions including post-traumatic stress disorder ("PTSD") and the loss of feeling in his left leg as a result of gunshot wounds he endured during his military service. He is currently serving a three-year-and-six-month sentence for violation of probation and possession of a firearm in the custody of Respondents at Cheshire Correctional Institution ("Cheshire CI"), a Level 4 security prison; he is also being held there pre-trial on separate charges, pending any future posting of bond. In light of the grave threat that COVID-19 poses to his health and life, Mr. Hurdle seeks immediate release on the grounds that Respondents have been violating—and continue to violate—his rights under the Americans with Disabilities Act and the Eighth and Fourteenth Amendments to the United States Constitution.

2.      COVID-19 is a highly infectious, novel coronavirus that has infected millions of individuals across the world in less than four months. Prisons are particularly susceptible to rapid,

uncontrolled viral spread due to close contact between incarcerated individuals, poor sanitation, and insufficient medical resources. These conditions place Mr. Hurdle at a high risk of exposure to and severe illness or death from COVID-19.

3.      Mr. Hurdle petitions this Court for a writ of habeas corpus to remedy his prolonged confinement in unlawfully dangerous conditions. He also seeks immediate release through admission to bail pending a decision on the underlying petition.

## PARTIES

4.      Petitioner Marcus Hurdle is a disabled veteran who suffers from PTSD and loss of use of his leg due to an in-service injury. Mr. Hurdle is currently incarcerated at Cheshire CI.

5.      Respondent Rollin Cook is the Commissioner of the Connecticut Department of Correction ("DOC").

6.      Respondent Kenneth Butricks is the warden of Cheshire CI.

## JURISDICTION

7.      This case arises under the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Eighth and Fourteenth Amendments to the United States Constitution.

8.      The Court has subject matter jurisdiction over this Petition pursuant to Article I, § 9, cl. 2 of the U.S. Constitution; the Eighth and Fourteenth Amendments of the U.S. Constitution; and 28 U.S.C. §§ 1331, 2241, 2254.

## VENUE

9.      Venue is proper in the District of Connecticut because Mr. Hurdle is physically present in Connecticut in the custody of Respondents, and because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district. 28 U.S.C. § 1391(b).

## FACTS

**A.      Petitioner Marcus Hurdle**

10.      Petitioner Marcus Hurdle is a 51-year-old disabled veteran incarcerated in a Level 4 institution for failing to attend a court-ordered group counseling session in violation of the terms of his probation as well as possession of a firearm. He is also being held pre-trial on separate charges. He is incarcerated at Cheshire CI, East Block 3. His inmate number is 188603.

11.      Mr. Hurdle was born in 1968 in New London, Connecticut. When he was around seven years old, his family moved to Macon, Georgia, and later to Atlanta. He graduated from Bass High School in Atlanta. He was raised by his mother and maintains a close relationship with her. Mr. Hurdle's father was incarcerated for approximately ten years beginning when Mr. Hurdle was about two years old.

12.      Mr. Hurdle has one younger sister, Lynette Hurdle-Bryant. They had a close relationship throughout their childhood, regularly attending church with their grandparents. They continue to speak almost daily. Mr. Hurdle is also on close terms with his sister's three daughters, and speaks with them regularly.

13.      Mr. Hurdle has nine children, ranging in age from 3 to 35, as well as three grandchildren. His children live in Connecticut, Georgia, and Pennsylvania. Mr. Hurdle is close with his children and provides for them however he can.

14.      After high school, Mr. Hurdle worked in construction and carpentry for several years. Seeking a more stable career, he joined the United States Navy in 1990. He wanted to make something of himself, make his family proud, follow in his grandfather's footsteps, and serve his country.

15.     Mr. Hurdle served in the Navy in the Gulf War Era, from June 1990 to July 1991. He worked as an engineman.

16.     While on leave in Atlanta to attend his grandfather's funeral, Mr. Hurdle was the victim of a traumatic shooting. In full dress uniform, while standing on a subway platform, he was shot four times in the leg. The attack severed his femoral artery, requiring multiple resuscitations, and necessitating nearly six months in the hospital for recovery.

17.     He received a General discharge from the U.S. Navy following this traumatic injury. When it was subsequently discovered that he had not received a psychological evaluation for a medical discharge, his discharge status was upgraded to Honorable.

18.     Mr. Hurdle also developed PTSD as a result of the shooting. His family noted marked changes in his behavior, including mood swings and increased argumentativeness, as he struggled with his trauma.

19.     His PTSD remained undiagnosed until 2012, however. Recognizing his condition and its severity, the Department of Veterans Affairs ("VA") has since rated him 100% disabled due to PTSD. Mr. Hurdle also suffers from anxiety and depression.

20.     As a result of the shooting, Mr. Hurdle has no feeling in and cannot use his left leg below the knee. He now has a permanent foot drop and difficulty standing or walking for extended periods of time without pain.

21.     The VA has rated him 40% disabled for loss of use of his left foot, 10% disabled for venous stasis, and 10% disabled for gunshot wound residuals, all arising from the same injury.

22.     Mr. Hurdle has struggled with substance abuse as he attempted to self-medicate to control his PTSD symptoms, leading to his incarceration on several occasions. He has occasionally faced homelessness.

23.     Mr. Hurdle has worked in restaurants and at the VA since his discharge from the Navy. His untreated PTSD has interfered with his ability to maintain employment.

24.     Mr. Hurdle's PTSD has also been exacerbated as a result of violent encounters he suffered in recent years, including being stabbed in 2013 and again in 2017. Before February 2019, Mr. Hurdle was seeking treatment for his mental health conditions.

25.     Prior to his incarceration, Mr. Hurdle lived with his partner of approximately seven years, Lori Esposito, in West Haven, Connecticut. He continues to have a close relationship with Ms. Esposito, speaking with her almost daily.

26.     In February 2019, Mr. Hurdle was found to have violated probation by failing to attend a court-ordered substance abuse counselling group and convicted of possession of a firearm. His underlying conviction for the probation violation concerned a protective order for Ms. Esposito. She has dropped all charges and asked the state to remove any related restrictions. He was sentenced to three years and six months' incarceration. He is scheduled to be released in June 2022.

27.     Mr. Hurdle is also being held under pre-trial detention for two charges arising out of a 2018 robbery. In December 2018, a $50,000 bond was posted for each charge, respectively, and Mr. Hurdle was released. Upon information and belief, following his re-incarceration for the probation violation in February 2019, his bond on the two 2018 charges was raised to $100,000 on each charge, or a total of $200,000. With $100,000 already posted in 2018, it appears that there is an outstanding bond amount of $100,000 on the 2018 charges.

28.     The onset of the COVID-19 pandemic has triggered or exacerbated many of Mr. Hurdle's PTSD symptoms. He experiences hypervigilance, paranoia, difficulty sleeping, and increased anxiety.

29.     Mr. Hurdle is unable to receive treatment for his PTSD as DOC has suspended normal programming due to COVID-19.

30.     Mr. Hurdle is confined to his cell for 22 hours a day. He is permitted to leave his cell only twice a day—for showers and phone calls. He is allowed one hour of time in the yard per week.

31.     Mr. Hurdle lives with a cellmate and cannot socially distance from him.

32.     Mr. Hurdle's entire block—approximately 40 men—is allowed out of their cells at the same time. There is little or no effort to ensure social distancing or proper sanitization of the unit. No one cleans the unit before or after this out-of-cell time.

33.     The lack of disinfectants and proper cleaning procedures further triggers Mr. Hurdle's PTSD symptoms. He is anxious when he touches the phones or other surfaces, and fears for his life when he is forced to be in close proximity to 40 other people under these conditions.

34.     Mr. Hurdle first received a mask approximately two weeks ago, in the third week of April 2020. No other protective equipment is available to him. He has no access to hand sanitizer or gloves.

35.     Prison officials do not share details on infection rates with him, but Mr. Hurdle has heard of multiple cases of COVID-19 at Cheshire CI, including one person who works in the kitchen.

36.     Transfers in and out of Cheshire CI have continued since the outbreak began. Mr. Hurdle is aware of people transferring in from Carl Robinson Correctional Institution.

37.     Mr. Hurdle could be released to the West Haven home of his partner, Lori Esposito, where he lived prior to his incarceration. He would have access to medical care from the West

Haven VA. *See* 38 C.F.R. § 17.36-17.38. He could also receive PTSD treatment remotely from the VA. He could self-quarantine in West Haven for as long as necessary. With the proper treatment and environment, Mr. Hurdle would be able to follow social distancing and containment guidelines appropriately.

38.     In the alternative, Mr. Hurdle could be released to his sister's home in Macon, Georgia. She could drive to Cheshire CI to pick him and transport him directly to her home for a period of quarantine.

39.     Mr. Hurdle's loved ones are anxious for his release from the dangerous conditions in which he is living. Mr. Hurdle fears that it is only a matter of time before he gets sick.

40.     Mr. Hurdle should be released to an environment where he can receive the treatment he needs, and where he has family support and a safe, stable place to live.

**B.     The COVID-19 Pandemic has Created a Statewide and National Emergency.**

41.     COVID-19 is a highly infectious, novel coronavirus that has reached pandemic status. As of May 7, 2020, more than 3.8 million individuals in at least 177 countries have been diagnosed with coronavirus and at least 268,000 people have died as a result.[1]

42.     In the United States alone, over 1.2 million people have been diagnosed with coronavirus as of May 7, 2020 (current as of the day of this filing),[2] with over 30,000 confirmed cases in the state of Connecticut.[3]

---

[1] New York Times, *Coronavirus Map: Tracking the Global Outbreak* (May 8, 2020), https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html.

[2] Centers for Disease Control and Prevention, *COVID-19: U.S. at a Glance*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases- in-us.html (last accessed May 7, 2020).

[3] Connecticut Department of Public Health, *COVID-19 Update* (May 7, 2020), https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary5072020.pdf?la=en (last accessed May 7, 2020).

43.     A vaccine for COVID-19 is not expected to be available until 2021 at the earliest.[4]

44.     COVID-19 is 10 times deadlier than the common flu.[5] It causes severe disease in approximately 16% of cases, with around 20% of infected patients requiring hospitalization. The observed fatality rate of COVID-19 will be significantly higher when local healthcare resources are overwhelmed.

45.     Fatality rates for coronavirus are increased in certain populations of individuals. People over the age of 50 are at higher risk from COVID-19.[6] Incarcerated individuals with serious mental illnesses, such as PTSD, will experience a significant worsening of mental health symptoms such as anxiety, panic attacks, depression, sleep disturbance, and suicidal ideation. They may as a result have a difficult time following social distancing, personal hygiene, and containment guidelines.

46.     Transmission of COVID-19 is thought to occur predominantly via person-to-person contact and contact with infected surfaces. Coughing and sneezing produce respiratory droplets which spread COVID-19 to individuals in close proximity—as far as six feet away. The virus can remain in the air for several hours and on surfaces for several days.

47.     Containment and social distancing are two main categories of interventions intended to prevent the spread of COVID-19. Containment includes intensive handwashing,

---

[4] James Gallagher, *Coronavirus vaccine: When will we have one?* BBC NEWS (Apr. 23, 2020), https://www.bbc.com/news/health-51665497.

[5] Daniel Flatley, *Coronavirus Is 10 Times Deadlier Than Seasonal Flu, Fauci Says*, BLOOMBERG (Mar. 11, 2020), https://www.bloomberg.com/news/articles/2020-03-11/fauci-warns-coronavirus-far-more-lethal-than-seasonal-flu.

[6] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): People Who May Be at Higher Risk for Severe Illness* (2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.

decontamination of surfaces, and identification and isolation of infected individuals and close contacts. Social distancing involves remaining 6 to 12 feet away from other people.

### C.      Incarcerated Persons Are Particularly Vulnerable to COVID-19 Infection.

48.      Prisons are particularly susceptible to the spread of infectious diseases. HIV, Hepatitis B and C, and tuberculosis are significantly more common in prisons than in the community-at-large. Severe outbreaks of H1N1 influenza occurred in prisons during the epidemic in 2009.

49.      Of the ten largest clusters of COVID-19 cases in the United States—all with at least 466 cases—eight are in prisons and jails. The largest single outbreak in the entire United States is at an Ohio prison, with 2,179 cases.[7]

50.      Many prison facilities lack the medical infrastructure necessary to identify, isolate, and treat infected individuals. Medical care is often provided by part-time or under-qualified individuals with inadequate personal protective equipment. These limited resources increase reliance on already-taxed outside healthcare facilities.

51.      Many prisons lack sanitary equipment to appropriately disinfect surfaces, and personal protective equipment for prisons and correctional staff.

52.      Asymptomatic persons can carry and transmit COVID-19. Screening and isolation of symptomatic cases alone will not prevent viral spread.

53.      Placement of incarcerated individuals in solitary confinement, as DOC has done for some persons who tested positive for the virus, is not an effective method of preventing exposure to COVID-19. Meal preparation and service necessitate contact with correctional staff, and

---

[7] New York Times, *Coronavirus in the U.S.: Latest Map and Case Count,* (Apr. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

hygiene activities such as showering carry the risk of exposure to infected surfaces. Moreover, fear of placement in solitary confinement may deter people from reporting symptoms to correctional officers, and may prevent detection of symptomatic people.[8]

54.     Profound stress and helplessness, such as that caused by imprisonment and prolonged confinement to a cell, can put individuals at risk of having suppressed immune systems. This in turns puts them at higher risk than the general population of contracting COVID-19 and potentially having more serious infections. Stress and its link to immunosuppression are well documented in the medical literature.[9]

**D.     Respondents Have Failed to Adequately Respond to COVID-19 in Connecticut Prisons Including Cheshire CI.**

55.     As of May 7 (the day of this filing), 361 DOC staff members and 484 inmates have tested positive for COVID-19.[10] Six people have died while in DOC custody.[11]

56.     The pace of deaths is escalating rapidly. On April 13, the first individual incarcerated in a Connecticut state prison died of COVID-19. That person was serving just a two-year sentence.[12] On April 26, a 57-year-old individual in a Connecticut state prison died of the

---

[8] David Cloud et al., *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional Settings* (Apr. 8, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf.

[9] Glaser R and Kiecolt-Glaser JK. *Stress-induced immune dysfunction: implications for health,* NAT REV IMMUNOL 5 (2005), 243-251; Segerstrom SC and Miller GE. *Psychological stress and the human immune system: a meta-analytic study of 30 years of inquiry.* PSYCHOL BULL (2004), 130: 601-630; Johnson JD, Campisi J, Sharkey CM, Kennedy SL, Nickerson M, Greenwood BN and Fleshner M. *Catecholamines mediate stress-induced increases in peripheral and central inflammatory cytokines.* NEUROSCIENCE 135 (2005), 1295-1307.

[10] Connecticut Department of Correction, *COVID-19 Tracker* (May 7, 2020), https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories.

[11] *Id.*

[12] Kelan Lyons, *First incarcerated person dies as COVID-19 spikes behind bars,* CT MIRROR (Apr. 13, 2020), https://ctmirror.org/2020/04/13/first-incarcerated-person-dies-as-covid-19-spikes-behind-bars/.

disease. He was set to be released in 2022.[13] On April 29, a third individual in the custody of Respondents died due to COVID-19. He was 74.[14] On May 4, two more individuals died, one of whom was 51 years old, the same age as Mr. Hurdle.[15] The very next day, another inmate died, bringing the death toll within DOC facilities to six.[16]

57.     The disease is also spreading rapidly. The number of confirmed positive cases among incarcerated persons within DOC's custody has more than doubled in just three weeks: from 227 confirmed cases as of April 16 to 484 confirmed cases as of May 7.

58.     More generally, Connecticut is currently experiencing a widespread outbreak of COVID-19, with 8,678 cases and 643 confirmed deaths in New Haven County alone, where Cheshire CI is located and where Respondents have confined Mr. Hurdle.[17] New Haven County has the second highest number of confirmed cases in Connecticut. Nonetheless, the prisons continue to face a constant influx of persons from community settings, including both correctional staff and newly incarcerated individuals.

59.     Conditions in Cheshire CI present significant potential for rapid spread of COVID-19. Incarcerated individuals are constantly in close proximity, and interact frequently with

---

[13] Meghan Friedmann, *Second CT inmate dies with coronavirus, lawsuit aimed to protect prisoners dismissed,* CT POST (Apr. 26, 2020), https://www.ctpost.com/news/coronavirus/article/ACLU-Judge-dismisses-lawsuit-seeking-to-release-15225981.php.

[14] *Third Department of Correction Inmate Dies From COVID-19 Virus: DOC,* NBC CONN. (Apr. 29, 2020), https://www.nbcconnecticut.com/news/local/third-department-of-correction-inmate-dies-from-covid-19-virus-doc/2263156/.

[15] *2 CT Prisoners Die Due to COVID-19 on Same Day*, NBC CONN. (May 4, 2020), https://www.nbcconnecticut.com/news/local/2-ct-prisoners-die-due-to-covid-19-on-same-day/2265727/.

[16] Olivia Lank, *DOC announces sixth inmate has died from COVID-19 complications*, WFSB (May 5, 2020), https://www.wfsb.com/news/doc-announces-sixth-inmate-has-died-from-covid-19-complications/article_c14813e8-8e43-11ea-8a4c-6baf609eeeed.html.

[17] Connecticut Department of Public Health, *COVID-19 Update* (May 7, 2020), https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary5072020.pdf?la=en.

communal surfaces. The facility layout does not allow for social distancing and spaces are poorly ventilated.

60.     Last week, six individuals incarcerated at Cheshire CI who tested positive have been transferred to Northern CI's Medical Isolation Unit: one on April 27, four on April 28, and one on April 29. On May 6, the day before this filing, another individual was transferred from Cheshire CI to Northern CI as a result of testing positive.

**E.     Petitioner Marcus Hurdle Is Especially Vulnerable to COVID-19.**

61.     Mr. Hurdle has a number of risk factors in addition to his status as an incarcerated individual that make him particularly vulnerable to severe COVID-19.

62.     Mr. Hurdle is 51 years old. People over the age of 50 face a heightened risk of contracting severe cases of COVID-19.

63.     Mr. Hurdle's PTSD also places him at unique risk from COVID-19. The overall disruption of daily routines, limitations on in-person visits, extended periods of time that inmates must spend inside their cells, and the reduced access to outside support systems including volunteer-led programs will worsen his mental health symptoms. His symptoms include anxiety, panic attacks, depression, sleep disturbance, and suicidal ideation, and his rating as 100% disabled by the VA confirms the severity of his conditions.

64.     Mr. Hurdle's chronic mental health conditions—which, as documented in the scientific literature, can contribute to immunosuppression—place him at increased risk of infection and developing serious COVID-19.

65.     Mr. Hurdle's physical disabilities also impede his ability to maintain a safe distance between himself and other inmates, and to practice personal hygiene.

66.     As a result, Mr. Hurdle is unable to carry out proper social distancing and personal hygiene in prison, including recommended frequent handwashing, while in prison. He is also less able to monitor his own health and communicate relevant health symptoms should he contract COVID-19. His physical disabilities, along with his PTSD, therefore place him at a higher risk of contracting COVID-19 and developing serious complications if infected.

**F.     Respondents Have Failed to Reasonably Accommodate Mr. Hurdle's Disabilities During This Crisis.**

67.     Respondents have suspended programming designed to mitigate the symptoms of PTSD and failed to provide alternative social and mental health support to inmates.

68.      Individuals with PTSD have an even greater need for counseling and social support during this public health crisis, due to the fear and anxiety caused by COVID-19.

69.     Respondents have also confined Mr. Hurdle to his cell for 22 hours a day, exacerbating Mr. Hurdle's PTSD symptoms.

70.     As a result, Respondents have denied Mr. Hurdle access to the services and reasonable accommodations he needs to protect his life and health.

## EXHAUSTION OF STATE COURT REMEDIES

71.     It appears that Respondents are holding Mr. Hurdle as both a convicted prisoner and a pretrial detainee. His challenge to his confinement as a pre-trial detainee arises under 28 U.S.C. § 2241, and this Court has held that his challenge to confinement as a convicted prisoner arises under 28 U.S.C. § 2254. ECF No. 6; *but see McPherson v. Lamont,* No. 3:20-cv-534-JBA, 2020 WL 2198279, at *4 (D. Conn. May 6, 2020) (state prisoners seeking release due to COVID-19 outbreak "are not attacking their underlying sentences. As such, § 2241 is the proper vehicle for their petition.").

72.     First, Mr. Hurdle challenges his custody arising from pre-trial charges, a challenge plainly cognizable under 28 U.S.C. § 2241. *See White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) ("[T]he general grant of habeas authority in § 2241 is available for challenges by a state prisoner who is not in custody pursuant to a state court judgment—for example, a defendant in pre-trial detention or awaiting extradition.").

73.     There is no statutory exhaustion requirement under 28 U.S.C. § 2241. To the extent that 28 U.S.C. § 2241 contains a prudential exhaustion requirement, that "requirement should be waived in light of the extraordinary circumstances presented by the COVID-19 pandemic." *McPherson*, 2020 WL 2198279, at *5.

74.     Second, this Court has "construe[d]" Mr. Hurdle's challenge to his custody arising from the post-adjudication sentence he is currently serving "as governed by 28 U.S.C. § 2254," not § 2241. Order to Show Cause, May 5, 2020, ECF No. 6; *cf. McPherson*, 2020 WL 2198279, at *4 (contrary conclusion).

75.     28 U.S.C. § 2254 ordinarily requires exhaustion of state remedies, but any failure to exhaust should be excused as futile.

76.     The Connecticut Judicial Branch is functionally unavailable to serve as an avenue for relief due to the unprecedented interruptions to all sectors of society caused by COVID-19.

77.     The Connecticut state courts are operating at severely reduced capacity. According to its March 12, 2020, Continuity of Operations Plan, the Judicial Branch was scheduling and hearing only items considered "Priority 1 Business Functions."

78.     Habeas petitions are not in the category of "Priority 1 Business Functions," nor are any other mechanisms by which individuals in the state's custody may challenge the legality of their confinement.

79.     Connecticut General Statutes § 52-466 requires that a petition for a writ of habeas corpus be made to the Superior Court for the Tolland Judicial District.

80.     As of the filing of this Petition, no courthouse is open in the Tolland Judicial District; no courthouse has been specified for transfer of matters ordinarily before that court.

81.     As of April 15, 2020, the six operating Superior Courts have begun accepting non-Priority 1 civil filings via lockboxes in their lobbies. There has been no provision made for filings at the Superior Courts, including the Tolland Judicial District, that are not currently operating, nor for expedited processing of emergency filings.

82.     Therefore, there is no state forum available to hear Mr. Hurdle's petition, rendering it impossible for him to seek relief from his continued confinement through the processes established by the State of Connecticut.

83.     "[T]he state court system is operating at such a diminished capacity that it may not be able to timely respond to a massive volume of emergency habeas petitions—a number potentially in the hundreds or thousands, given the size of the putative class—in the urgent manner that those petitions require." *McPherson*, 2020 WL 2198279, at *7.

84.      A petition arising under either 28 U.S.C. § 2241 or 28 U.S.C. § 2254 is not subject to an exhaustion requirement when pursuing state remedies would be futile, including in the "absence of a state corrective process" or when "circumstances exist that render state processes ineffective to protect petitioner's rights." *Id.* § 2254(b)(1)(B)(i-ii); *see Duckworth v. Serrano*, 454 U.S. 1, 3 (1981); *Washington v. James*, 996 F.2d 1442, 1449 (2d Cir. 1993).

85.     The functional closure of Connecticut courts in the face of the COVID-19 pandemic constitutes the absence of a state corrective process and circumstances that render state processes ineffective to protect Mr. Hurdle's rights.

86.     Inordinate delay in processing claims can also render exhaustion futile. *U.S. ex rel. Goodman v. Kehl*, 456 F.2d 863, 869 (2d Cir. 1972). To the extent that the state courts are conducting any business, their pace is insufficient to protect Mr. Hurdle's rights. Meanwhile, the number of confirmed cases in DOC facilities continue to rise.

87.     Given the unprecedented circumstances created by COVID-19, a delay of even days or weeks in docketing and considering Mr. Hurdle's claim for relief constitutes a violation of his rights, and could threaten his very life.

88.     As Judge Arterton recently concluded, "[g]iven the reality of the disease, which is spreading in Connecticut prisons, and the consequence of potentially catastrophic health outcomes, . . . exhaustion of state remedies would be futile, because, under current conditions, [DOC inmates] are at substantial risk of contracting the disease prior to completing the exhaustion process." *McPherson*, 2020 WL 2198279, at *7.

### JUDICIAL AUTHORITY TO ADMIT TO BAIL AND ENLARGE PETITIONER'S CUSTODY

89.     This Court has the "inherent authority" to admit a state prisoner to bail and order his immediate physical release pending adjudication of his habeas petition. *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *see also Rado v. Meachum*, 699 F. Supp. 25, 26 (D. Conn. 1988) ("A federal court has the inherent power to release a state prisoner on bail pending resolution of his habeas petition.").

90.     This judicial power is also known as "enlargement," whereby a prisoner is physically but not legally released, remaining within DOC's custody but in a different location.

*See, e.g.*, *Wilson v. Williams*, --- F.Supp.3d ---, No. 4:20-cv-794, 2020 WL 1940882, at *4 (N.D.Ohio Apr. 22, 2020). In other words, "[w]hen a court exercises its power to 'enlarge' the custody of a defendant pending the outcome of a habeas action, the [department of corrections] maintains custody over the defendant, but the place of custody is altered by the court." *Id.*

91.     To qualify for admission to bail or enlargement, an individual must show that "extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 230.

92.     The risk that COVID-19 poses to Mr. Hurdle given his age, serious mental illness, and physical disabilities is an extraordinary circumstance that warrants his immediate release. If Mr. Hurdle remains incarcerated, there is a high risk he will contract COVID-19 and as a result suffer severe physical illness, worsening of his mental illness, or death. Immediate physical release, or an enlargement of the physical confines of Mr. Hurdle's custody, is therefore the only way for Mr. Hurdle to vindicate the habeas remedy.

## LEGAL CLAIMS

## FIRST CAUSE OF ACTION

## <u>VIOLATION OF AMERICANS WITH DISABILITIES ACT</u>

93.     Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

94.     Title II of the Americans with Disabilities Act ("ADA") prohibits public entities from discriminating against qualifying individuals with disabilities by depriving them of the opportunity to participate in services, programs, or activities of the public entity because of a disability. 42 U.S.C. § 12132.

95.     DOC is a public entity covered by Title II of the ADA. 42 U.S.C. § 12131.

96.     Mr. Hurdle's PTSD and mobility-impairing leg injury qualify as disabilities under the ADA in that they are physical and mental impairments that substantially limit major life activities. 42 U.S.C. § 12102(1).

97.     Mr. Hurdle's PTSD substantially limits major life activities including sleeping, thinking, decision-making, communicating, bathing, and caring for himself.

98.     Mr. Hurdle's leg injury substantially limits major life activities including standing and walking normal distances. 42 U.S.C. § 12102(2).

99.     Mr. Hurdle has a record of both of his impairments. 42 U.S.C. § 12102(1)(B). Mr. Hurdle is regarded as having such impairments. 42 U.S.C. § 12102(1)(C). As set forth above, the VA has recognized his PTSD as 100% disabling. The VA has also recognized the conditions of his leg arising from his gunshot wounds as 60% disabling in total.

100.    Mr. Hurdle's PTSD as well as his mobility impairments are precisely the types of disabilities contemplated by Congress when it passed the ADA Amendments Act of 2008. Federal regulations recognize that both PTSD and mobility impairments "easily" fall under the ADA.

101.    The current conditions at Cheshire CI severely worsen Mr. Hurdle's already-debilitating PTSD. As set forth above, his PTSD developed after he suffered multiple gunshot wounds to his leg while serving in the Navy. Lack of a stable support system and experiencing additional dangerous or stressful events can increase risk of triggering PTSD symptoms after a traumatic event. Without the ability to leave his cell for 22 hours a day, Mr. Hurdle no longer has a stable support system. Simultaneously, Mr. Hurdle is experiencing an additional traumatic event: the advent of a life-threatening virus in prison.

102.    Worsening symptoms impair Mr. Hurdle's ability to fully comply with containment strategies, which place him at a heightened risk of exposure to the virus. Mr. Hurdle is less able to monitor his health and effectively communicate his symptoms due to his PTSD.

103.    Mr. Hurdle is entitled to access to programming and treatment for PTSD. Appropriate treatments for PTSD include psychotherapy and medication. Respondents are required under the ADA to offer him such accommodations for his disability, but due to the advent of COVID-19, Mr. Hurdle is not receiving those services.

104.    In sum, Mr. Hurdle is forced to remain in his cell for 22 hours a day and lacks mental health care services or social support, while he experiences an unprecedented traumatic event in the form of COVID-19. All of this worsens his PTSD symptoms and his risk of exposure to COVID-19. And Respondents cannot provide Mr. Hurdle with the mental health services that he needs.

105.    Respondents are violating Title II of the ADA by failing to provide Mr. Hurdle with reasonable accommodations necessary and available to protect his life and health—which in this case include granting him immediate release into the care of a custodian who is able to ensure his health and safety.

**SECOND CAUSE OF ACTION**

**<u>VIOLATION OF EIGHTH AMENDMENT</u>**

106.    Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

107.    Mr. Hurdle is currently serving a 2019 sentence of incarceration in the custody of respondents. The Eighth Amendment protects prisoners from cruel and unusual punishment, which extends to conditions of confinement. Prisons have an affirmative obligation to provide adequate

care to address prisoners' medical needs, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and officials may not ignore conditions that are likely to cause grave illness in the future, *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003).

108.     The Eighth Amendment's protection of prisoners' medical needs extends to mental health needs. *See, e.g.*, *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care [for purposes of the Eighth Amendment]."); *Young v. Choinski*, 15 F. Supp.3d 172, 184 (D. Conn. 2014) (collecting cases).

109.     COVID-19 presents a high risk of serious illness or death for individuals with underlying health conditions and for individuals of advanced age. Mr. Hurdle has experienced hypervigilance, paranoia, difficulty sleeping, and increased anxiety as a result of the COVID-19 outbreak. Respondents have confined Mr. Hurdle to his cell for 22 hours a day without access to mental health treatment. Mr. Hurdle's mental health challenges and his other disabilities— especially his injured leg—make it more difficult for him to carry out containment strategies like social distancing and frequent handwashing, and to communicate symptoms if they develop.

110.     DOC officials are aware of these risks and have failed to take reasonable steps to prevent future harm. Their insufficient response has created unconstitutional conditions of confinement.

111.     Respondents thus have both denied Mr. Hurdle the essential mental health medical care he needs *and* greatly exacerbated his acute mental health symptoms by subjecting him conditions in which COVID-19 can spread rapidly and uncontrollably.

112.    Respondents and other DOC staff continue to knowingly and recklessly subject Petitioner to conditions under which he faces imminent risk of contracting COVID-19—intensifying his current mental health medical needs at the same time.

113.    Respondents' failure to take appropriate steps to abate this risk constitutes deliberate indifference to Petitioner's right to be free from cruel and unusual punishment.

114.    Respondents can fulfill the constitutional requirement to mitigate the risk at which they have placed Petitioner only by releasing him. *See also DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, . . . medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment . . .").

115.    Respondents are violating Mr. Hurdle's Eighth Amendment rights by continuing to confine him in conditions that greatly increase his risk of exposure to COVID-19, which could prove deadly due to his age, PTSD, and other disabilities.

### THIRD CAUSE OF ACTION

### VIOLATION OF FOURTEENTH AMENDMENT

116.    Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

117.    Mr. Hurdle is also a pre-trial detainee detained by Respondents on two 2018 robbery charges, pending the posting of the $100,000 remainder of a $200,000 bond. As a pre-trial detainee, Mr. Hurdle is protected under the Due Process Clause of the Fourteenth Amendment. The Fourteenth Amendment requires that corrections officials provide for the reasonable health and safety of persons in pre-trial custody. *Youngberg v. Romeo*, 457 U.S. 307, 315-316, 324

(1982). The Fourteenth Amendment affords pre-trial detainees protections "at least as great as the Eighth Amendment protections available to a convicted prisoner." *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998) (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

118.    Respondents are violating Mr. Hurdle's Fourteenth Amendment rights because, even knowing that COVID-19 poses an excessive risk to his health and safety, they have failed to act with reasonable care to mitigate that risk. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

119.    Respondents have placed Mr. Hurdle in conditions of confinement which worsen his already-disabling mental health conditions and PTSD. Respondents know or should know that Petitioner's PTSD and risk of suicidal ideation under current conditions of confinement pose an excessive risk to his health and safety. By continuing to incarcerate Mr. Hurdle under conditions that dangerously exacerbate his PTSD, Respondents have violated his rights under the Fourteenth Amendment. *Darnell*, 849 F.3d at 35.

120.    A pre-trial detainee's conditions of confinement are also unconstitutional under the Fourteenth Amendment where "conditions amount to punishment." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Conditions not intended to amount to punishment are unconstitutional when they are "excessive" in relation to their purpose. *Almighty Sup. Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017) (quoting *Bell*, 441 U.S. at 538). Keeping Mr. Hurdle in a dangerous environment at high risk of infection by COVID-19, confining him in his cell for 22 hours a day, and depriving him access to mental health care is an excessively punitive measure for the purpose of keeping him safe in prison, when he could be released to the care of his partner or a safe house instead.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner Marcus Hurdle respectfully requests that the Court:

a) Admit him to bail and order his immediate release, or enlarge the confines of his physical custody, pending disposition of the underlying petition, *see Mapp*, 241 F.3d at 226;

b) Order prompt return by Respondent Commissioner Cook and Warden Butricks;

c) Issue a Writ of Habeas Corpus and order his release from custody to the home of his partner, Lori Esposito at West Haven, CT, or another appropriate community placement;

d) Award him his costs and reasonable attorneys' fees; and

e) Grant such other and further relief as this Court deems just and proper.


Respectfully submitted,

/s/ Michael J. Wishnie
Bardia Faghihvaseghi*
Jade Ford*
Arjun Mody*
Kayla Morin*
Cara Newlon*
Molly Petchenik*
Leah Samuel*
Blake Shultz*
Casey Smith*
　　 Law Student Interns
Renee Burbank, Supervising Attorney, ct30669
Marisol Orihuela, Supervising Attorney, ct30543
Michael J. Wishnie, Supervising Attorney, ct27221
Jerome N. Frank Legal Svcs. Org.
Veterans Legal Services Clinic
P.O. Box 209090
New Haven, CT 06520
Phone: (203) 432-4800
michael.wishnie@ylsclinics.org

*Counsel for Petitioner*
*Motion for Law Student Appearances
Forthcoming.

Dated: May 7, 2020