UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARCUS HURDLE, | : | CIVIL NO. 3:20-cv-00605 (KAD) |
| *Petitioner,* | : | |
| | : | |
| v. | : | |
| | : | |
| ROLLIN COOK, *et al* | : | MAY 19, 2020 |
| *Respondents.* | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
RESPONDENTS' OBJECTION TO PETITIONER'S AMENDED PETITION FOR WRIT
OF HABEAS CORPUS AND MOTION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

I.      **PRELIMINARY STATEMENT[1]**

Marcus Hurdle ("Petitioner"), is a lawfully incarcerated inmate currently in custody at

Cheshire Correctional Institution ("CCI").  Petitioner requests this Court circumvent statutory

law, as well as, the criminal justice process by ordering his immediate release from custody.

Rollin Cook and Kenneth Butricks ("Respondents") respectfully submit this memorandum of

law in support of their motion to dismiss the Amended Petition for Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2241, or in the alternative, 28 U.S.C. § 2254 (ECF #15) and Petitioner's

Motion for Temporary Restraining Order (ECF #16 and #17) pursuant to Fed. R. Civ. P 12(b)(1),

12(b)(6), or, alternatively, for summary judgment pursuant to Fed. R. Civ. P. 56.

As a threshold matter, this Court should not hear Petitioner's claims as he has not

exhausted his state court remedies.  Currently Petitioner is in custody both as a sentenced inmate,

as well as, a pre-trial detainee (Amend. Pet., ECF #15, at 13, ¶71.)  And, although Petitioner

claims this Court should review his Petition under the auspices of § 2241, this Court has already

---

[1] Due to statewide computer outages on 5/20/20 the exhibits supporting this Objection shall be filed ASAP.

correctly determined this case to fall squarely under § 2254[2]. (Order to Show Cause, ECF #6, at 2.)  Section 2254 specifically requires the Petitioner to fully exhaust any state court remedies prior to seeking relief in a federal court or otherwise prove the absence of that process. Petitioner specifically alleges that any failure to exhaust should be excused as futile.  However, Petitioner fails to provide sufficient facts to state that the state courts remedies have been unavailable to him or that he has even made the attempt to engage such processes.  This is fatal to his claims.

Should this Court however find that the Petitioner gets past this preliminary bar, his claims still fail as he has presented an inaccurate picture of the current status inside CCI and the extraordinary measures the Connecticut Department of Corrections ("DOC") has taken in an effort to maintain the health and safety of the inmates in their custody in light of the COVID-19 pandemic.  The efforts taken by the DOC belie the suggestion that they are failing to take the threat posed by COVID-19 seriously or that they have been deliberately indifferent in any way. Petitioner cannot establish that there has been any violation of his Eighth or Fourteenth Amendment rights arising from the current conditions at CCI, nor can he establish that the Respondents have failed to accommodate his disabilities in violation of the Americans with Disabilities Act ("ADA").

---

[2] "Accordingly, when faced with a Section 2241 petition from a petitioner in state custody who challenges the execution of his sentence, it is proper for the district court to construe the petition as arising under Section 2254. *See Cook*, 321 F.3d at 278; *see also Musciotto v. Nardelli*, No. 3:19-CV-559 (KAD), 2019 WL 5086691, at *3 (D. Conn. Oct. 10, 2019) (construing petition filed under Section 2241 as governed by Section 2254 where petitioner was a state prisoner challenging a detainer lodged by another state, which the Court found tantamount to a challenge to the execution of his sentence)."

## II.    FACTUAL BACKGROUND

### a.  DOC's Response to the COVID-19 Pandemic

There is no debate that the COVID-19 pandemic is the most significant health crisis this country has faced in some time.  The impact to the State of Connecticut is no less significant.  Everyone has been impacted by the COVID-19 pandemic and the inmate population is no exception.  However, to allege that the DOC has not taken the pandemic seriously and that the Respondents have not diligently instituted protocols and procedures in order to combat the virus and protect the health and safety of the inmates in their custody is a gross misunderstanding.

As of May 18, 2020, the total inmate population in DOC facilities stands at 10,554.  That includes 2,997 unsentenced detainees and 7,557 sentenced inmates.  That is a substantial drop in population from March 1, 2020, where the inmate population consisted of 3,373 unsentenced detainees and 9,036 sentenced inmates or a total population of 12,409.  That is a reduction of 1,855 inmates (approximately 15%) in custody within a span of 2.5 months.  In addition to reducing the inmate population the DOC has implemented significant measures to combat the pandemic.

On March 23, 2020 the CDC provided guidance to correctional and detention facilities[3].  In an effort to conform to the guidelines the DOC took many steps to prevent or minimize infiltration of the virus into their facilities.    Social visits were cancelled, quarantine of new admits, limiting inmate transfers, and cancelling volunteer and limiting contractor access were initiated early on.  (Exhibit A, Kennedy Dec., at 3-4, ¶18.)  All staff members have their temperatures checked prior to entry into the facility.  *Id.*  If any staff member has a temperature

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.  *See also*, declaration of Dr. Byron Kennedy (attached, Exhibit A)

greater than 100.4 or exhibits any COVID-19 related symptoms they are denied entry.  *Id.* at 4, ¶19.  Within the facilities other measures were taken to prevent or further limit the spread of the virus.  Soap and cleaning supplies are widely distributed, common areas and frequently touched surfaces are cleaned and disinfected, and recreation was modified to increase social distancing measures.  *Id.* ¶20.  Where feasible inmates have been provided their meals in their cells to further increase social distancing.  *Id*.  Inmates have been provided education on proper hygiene via posters and/or memos handed to them.  *Id*. at 5, ¶26.

Unfortunately, the COVID-19 virus did infiltrate some facilities and both staff and inmate have been infected.  In an effort of transparency, the DOC created a COVID-19 Tracker and placed it online[4].  The tracker is maintained constantly with data updated daily.  According to the tracker as of May 15, 2020 there have been 598 total inmates who have contracted COVID-19 with 444 of them being medically cleared and returned to their original facility.  369 staff members have contracted COVID-19 with 299 being medically cleared to return to work.  The DOC implemented protocols for the quarantine of possible cases of infection and the medical isolation of those testing positive or exhibiting symptoms.  *Id*. at 4, ¶¶22-23.  As of April 7, 2020, the Northern Correctional Institution ("NCI") was designated as the medical isolation unit.  *Id*. at 2, ¶10.  NCI was chosen because, consistent with CDC Guidelines, it was the best match for medical isolation as it has single cells with individual bathroom facilities, solid walls and doors, and has separate airflow from other parts of the facility.  *Id*. at 2-3, ¶12.  If a staff member is exhibiting symptoms during their shift, despite passing the initial protocols for entering a facility, they are immediately isolated and sent home, a review of who they have come

---

[4] https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories

into contact with is conducted and those individuals are monitored for symptoms. *Id*. at 5, ¶25. Any areas the employee came into contact with are then cleaned and disinfected. *Id*.

### b.  Measures Taken Specific to Cheshire Correctional Institution

Respondent Warden Butricks is responsible for implementing the DOC procedures and protocols identified above at CCI.  CCI has a mixture of dorm and cell style housing.  (Exhibit B, Butricks Dec., at 2, ¶6.)  Although the dorm units have capacity for 128 inmates there are only 22 in the unit.  *Id*.  Currently, CCI has 1,122 inmates.  *Id.*  However, there is a total capacity for 1,648 inmates.  *See* (Exhibit A to Declaration).  Therefore, CCI is only filled at 68% capacity.  In addition to this reduced capacity, many steps have been taken to increase the inmates' ability to socially distance themselves.  Recreation consists of only 50 inmates at a time in an area the size of two football fields.  *Id*. at 2, ¶7.  Group and other congregate programming have been suspended.  *Id*.  However, individualized religious care is being provided and classroom lesson plans are handed out.  *Id*.  Sports such as basketball have been disallowed due to the close personal contact between the players. *Id*.  Meals are provided to the inmates in North and South blocks for eating in their respective dayrooms.  *Id*.  In the East block meals are provided to the inmates for eating in their cells.  *Id*.  Guidance as to proper hygiene, protective equipment, and reporting of symptoms have been provided in the form of posters throughout the facility and reinforced through constant oral reminders.  *Id*., ¶8.

Cleaning of the facility has increased as a result of the pandemic.  Common areas such as dayrooms and bathrooms are now cleaned continuously throughout the day utilizing multiple cleaners and disinfectants.  *Id*. at 3, ¶9.  Showers are cleaned at least two to three times per day. *Id*., ¶10.  Cells are cleaned three times per week and inmates are given the same cleaners and disinfectants and used in the common areas.  *Id*., ¶11.  Inmate phones are cleaned routinely and

continuously throughout the day.  *Id*. at 4, ¶12.  Soap has been distributed to inmates regardless

of whether they are indigent or not.  *Id*., ¶13.  Soap is still available in the commissary but will

be distributed for free for the length of the pandemic. *Id*.  If an inmate runs out of soap, they will

receive additional soap on request.  *Id*.

Staff and inmates have been provided Personal Protective Equipment ("PPE") according

to the level necessary for the situation as identified by the CDC Guidelines.  *Id*. at 4-5, ¶¶15, 17.

Each inmate had been provided four (4) cloth masks and may have them laundered on a weekly

basis as necessary.  *Id*.  Staff have been issued cloth masks and are required to don additional

PPE as necessary for the situation.  *Id*. at 5, ¶16.  Staff are required to wear their masks at all

times while in the facility. *Id*.

### c.  Based on Petitioner's Current Sentence, Pending Charges, and Criminal History he is a Poor Candidate for Early Release

Community Release is a mechanism through the DOC by which an inmate may be

released prior to his end of sentence.  (Exhibit C, Galligan Dec., at 2, ¶5.)  There are several

avenues within Community Release and several placements possible.  *Id.*, ¶¶6-9.  Review for

Community Release is completed by the Community Release Unit ("CRU".)  *Id.* at 1, ¶3.

Respondents' authority to release inmates prior to the end of their sentences is conferred and

limited by statute.  *Id*. at 6, ¶32.  The Respondents have no statutory authority pertaining to

matters of bail.  *Id*.

Petitioner is currently serving a total effective sentence of 3 years, 6 months for

convictions for 53a-32 (Violation of Probation with an underlying offense of 53a-61 Assault in

3rd Degree), 53a-223 (Violation of Protective Order under Docket # A22M - CR - 14 - 0086982

– S),  53a-32 (Violation of Probation with an underlying offense of 53a-223 Violation of

Protective Order under docket # A22M - CR - 15 - 0158739 – T), and 53a-217C Criminal

Possession of a Firearm.  *Id*. at 4-5, ¶23.  Petitioner's end of sentence is scheduled for June 22, 2022.  *Id.*  In addition to the above criminal sentences Petitioner is also facing charges under three dockets: AAN -CR18-0097217-T; 53a-100aa Home Invasion, 53a-134 (a)(4) Robbery 1st Degree Firearm, 53a-134 Robbery 1st, 53a-217 Criminal Possession of a Firearm; docket A22M-CR18-0097218-S with companion docket A22M-MV18-0058594-S; 53a-63 Reckless Endangerment 1st, 53-167a Interfering with Officer, 14-223 (b) Engaging Police in Pursuit, 14-222 Reckless Driving.  *Id*. at 5, ¶25.  Petitioner has a current court date of June 9, 2020 for the pending charges[5].  *Id*., ¶26.  Due to the charges for which he is currently serving his sentence, Petitioner is ineligible for DOC Community Release.  *Id*. at 5-6, ¶28-30.  Depending on the final disposition of the pending charges, Petitioner's future eligibility for Community Release is currently unknown.  *Id*.

Even if the Petitioner were otherwise eligible, a review of his extensive criminal history indicates he is a poor candidate for early release.  Petitioner also poses a clear risk to public safety based on his criminal record including: out of state arrests, arrests during his time in the military, failures while on prior community supervision, acts of violence including violence against one of the proposed home plan partners, and weapon related offenses.  *Id.* at 6, ¶31. Petitioner's criminal history in Connecticut alone consists of 27 arrests with three being the current charges against him.  *Id*., ¶32.  His first conviction was in 1988 prior to his military service.  *Id.* at 7, ¶33.  In addition to his criminal history from multiple states, he has had several periods of confinement in the DOC starting in 1989.  *Id*., ¶¶34, 35.  Petitioner has several failures to abide by community release and parole conditions in addition to violations of the laws of the State of Connecticut. Id., ¶36.  Petitioner has convictions for crimes that include; assault,

---

[5] Petitioner has bonds totaling $200,000 See Amend Pet for Writ at 5, ¶27.

violations of protective orders, robbery, larceny, burglary, failure to appear, and drug offenses. *Id.*, ¶38. Considering this extensive and violent criminal history, current pending charges with their possible lengthy terms of imprisonment and lack of prior adherence to conditions of parole or release, there is no reasonable belief that, if released now, the Petitioner will abide by any conditions set by the court. *Id*. at 8, ¶¶40-41.

### d.  Petitioner's Current Medical Status

Petitioner is a 51-year-old male with a current medical level of 1, correlating to a minimal or no medical diseases. (Exhibit D, Freston Dec. at 1, ¶7.). A review of the medical records does indicate that the Petitioner has history of PTSD associated with his Naval service his last treatment was with the Veterans Administration more than a year ago. *Id.* at 2, ¶14. During his current incarceration he has had encounters with Mental Health services and has denied psychological symptoms and declined Mental Health services. *Id.*, ¶¶15-16. Petitioner has educated on how to request Mental Health services should he need them. *Id.*, ¶17. Currently Petitioner does not have a medical condition which would place him in a COVID-19 high risk category. *Id.*, ¶18

### e.  Amended Petition and Alleged Facts

According to the Petitioner he is a 51-year-old disabled veteran. Amend. Pet. For Writ, ECF #15 at 3, ¶10. He suffered a severe injury to his left leg when, while on leave, he was shot four times. *Id*. at 4, ¶16. The damage to his left leg has left him with no feeling below the knee, permanent foot drop, and difficulty standing or walking for extended periods of time. *Id*. at ¶20. Petitioner further alleges that as a result of the shooting incident he developed PTSD, but it remained undiagnosed until 2012. *Id*., ¶¶18-19. Petitioner claims that the facility where he is currently housed has poor sanitation and insufficient medical resources. *Id*. at 2, ¶2.

The gravamen of Petitioner's claims appears to be that "The onset of the COVID-19 pandemic has triggered or exacerbated many of Mr. Hurdle's PTSD symptoms." (ECF #15 at 5, ¶28[6]) and, that he is 51 years old[7] with leg injuries.  He further alleges that "[t]he lack of disinfectants and proper cleaning procedures further triggers Mr. Hurdle's PTSD symptoms."  *Id.* at 6, ¶33.  Petitioner alleges additional issues with inability to social distance, confinement to his cell, anxiety regarding touching phones, inadequate PPE or hand sanitizer, and lack of COVID-19 details from staff.  *Id.* at 6, ¶¶30-35.

## III.   ARGUMENT

Petitioner's claims fail, *ab initio*, as he has not fully exhausted his state court remedies which are required before he can seek relief from a federal court.  There is no legitimate reason the Petitioner has put forth which could lead to the conclusion that the Connecticut Superior Courts is not open and available to hear petitions or motions seeking this petitioner's relief from state custody.

However, should this Court accept the Petitioner's allegation that he should be excused from any exhaustion requirement due to futility, his claims still fail as he cannot satisfy the requirements for a mandatory restraining order as he cannot make a substantial showing of likelihood of success on the merits either under the Eighth, Fourteenth Amendments or under the ADA.

---

[6] *See also* "[t]he presence of COVID-19 within Cheshire CI has significantly worsened Mr. Hurdle's PTSD symptoms" (ECF #17 at 12)
[7] The CDC lists people of age 65 and older are at greater risk.  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

### a. The Petitioner's Claims Are Barred for Failure to Fully Exhaust His State Court Remedies

The Petitioner originally brought his petition pursuant to 28 U.S.C. § 2241, or in the alternative under 28 U.S.C. § 2254. (First Pet. For Writ, at 2, ¶8.) This Court correctly determined that, despite the assertions of the Petitioner, the facts of this case countenance that § 2254 is the proper vehicle for habeas relief review. As § 2254 applies, the Petitioner is therefore required to fully exhaust any State Court remedies available to him prior to bringing the action in federal court[8]. To the extent that the Petitioner seeks to have this Court reconsider its previous ruling as a result of the recent decision in *McPherson v. Lamont*, No. 3:20-cv-534 (JBA), 2020 WL 2198279, (D.Conn May 6, 2020) the Respondents note that ruling is highly contested and was wrongly decided in contravention of binding 2nd Circuit caselaw.

As this Court noted in its Order to Show Cause, *supra*, *Cook v. New York State Div. of Parole*, 321 F.3d 274, (2nd Cir. 2003.) controls. "[I]f an application that should be brought under 28 U.S.C. § 2254 is mislabeled as a petition under section 2241, the district court must treat it as a section 2254 application instead…[I]t is the substance of the petition, rather than its form, that governs…The district court correctly treated Cook's petition as an application under section 2254. By its terms, section 2254 applies to "application[s] ... in behalf of ... a person in custody pursuant to the judgment of a State court ... on the ground that [the person applying] is in custody

_____

[8] 28 U.S.C. §2254. State custody; remedies in Federal courts

   (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

   (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that-

       (A) the applicant has exhausted the remedies available in the courts of the State;

in violation of the Constitution ... of the United States." 28 U.S.C. § 2254(a). That characterizes

Cook's petition precisely." *Id.* at 277-78.

Mr. Hurdle's petition is also precisely characterized as one falling under § 2254.

Petitioner is in the custody of the DOC as a result of convictions  in Connecticut criminal courts.

It would be quixotic to do as petitioner suggests and also consider the Petitioner's claims under §

2241 due to his "pre-trial detainee" status since regardless of the outcome of any pending

criminal matters, the Petitioner will remain a convicted state prisoner for another two (2) years.

Therefore, this court should treat the petition as one pursuant to § 2254.

### i.  Petitioner's claims are barred for failure to exhaust State Remedies under § 2254

"A prerequisite to federal habeas corpus relief under 28 U.S.C. § 2254 is the exhaustion

of available state court remedies."  *Green v. Wright*, No. 3:19-CV-52 (CSH), 2019 WL 7879730,

at *4–5 (D. Conn. Sept. 10, 2019) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999)).

"The Second Circuit requires the district court to conduct a two-part inquiry to determine

exhaustion."  *Id*. (citing *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005)).  "First, a federal

court must examine whether applicable state court remedies remain available to the petitioner."

*Id*.  "In this regard, the petitioner 'need not have invoked every possible avenue of state court

review.'"  *Id*.  (quoting *Galdamez*, 394 F.3d at 73).  "Rather, 'state prisoners must give the state

courts one full opportunity to resolve any constitutional issues by invoking one complete round

of the State's established appellate review process.'"  *Id*. (quoting *O'Sullivan*, 526 U.S. at 845).

"A 'complete round' requires the petitioner to present his claim to the highest court of the state

and apprise that court of 'both the factual and the legal premises of the federal claims ultimately

asserted in the habeas petition.'"  *Id*. (quoting *Galdamez*, 394 F.3d at 73 (citations omitted)).

"Second, ... the federal court must assess whether the petitioner 'properly exhausted those [state] remedies, i.e., whether [petitioner] has fairly presented his [or her] claims to the state courts,' such that the state court had a fair opportunity to act." *Id*. (quoting *Galdamez*, 394 F.3d at 73). "This inquiry 'embodies the concept of procedural default.'" *Id*. (quoting *Galdamez*, 394 F.3d at 73). "The procedural default doctrine 'ensur[es] that state courts receive a legitimate opportunity to pass on a petitioner's federal claims and that federal courts respect the state courts' ability to correct their own mistakes." *Id*. (quoting *Galdamez*, 394 F.3d at 73). "Thus, to properly exhaust a federal habeas claim in state court, the petitioner 'must put state courts on notice that they are to decide *federal constitutional claims*.'" *Id*. (quoting *Petrucelli v. Serrano*, 735 F.2d 684, 687 (2d Cir. 1984) (emphasis in original). "The exhaustion requirement 'expresses respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions'—state and federal." *Id*. (quoting *Petrucelli*, 735 F.2d at 687).

"For purposes of exhaustion, adequate notice to the state court includes: (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Id*. at *5 (quoting *Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982)). "Requiring such notice is not unreasonably burdensome on state prisoners." *Id*. (citing *Baldwin*, 541 U.S. at 32).

Here, this Court should deny hearing the Petitioner's claims because he has not fully exhausted his remedies in state court[9]. Petitioner only alleges that he should be excused from

---

[9]*Pichard v. Connor*, 404 US 270, 275 (1971), ("It has been settled since *Ex parte Royall*, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), that a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus."); *see also*, *Pitchess v. Davis*, 421 US 482, 487 (1975)

attempting to exhaust State Court remedies because they would be futile.  Amend. Pet. for Writ at 14, ¶75.  Critically, he offers no evidence or allegations of fact to show that he even attempted to file a habeas or other challenge to his underlying sentence in any state court.  As will be more thoroughly explained below the Connecticut Superior Courts are open and hearing cases.  The Petitioner is not just in custody as a pre-trial detainee.  He is a lawfully sentenced inmate who also happens to have additional charges pending.  His unilateral and unsupported assumption that the State's courts are not open to hear habeas claims is insufficient to prove unavailability of a state forum to raise his challenges to his incarceration.

### ii. Petitioner is not excused from exhaustion requirement as the State Courts are open and hearing matters

Petitioner suggests that this Court should excuse his failure to exhaust because it would be futile to pursue them.  Petitioner alleges that the Connecticut State Courts are only considering "Priority 1" category of cases, that habeas petitions are not included in that category, and that there are no open courthouses in which to hear habeas cases.  (*Id*. at ¶¶77-78.)

"Failure to exhaust state court remedies may be excused only if 'there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient to render futile any effort to obtain relief.'"  *Id*. (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (*per curiam*)); *see also* 28 U.S.C. § 2254(b)(1)(B).  "Furthermore, the petitioner may not simply wait until appellate remedies are no longer available and then argue that the claim is exhausted."  *Id*. (citing *Galdamez*, 394 F.3d at 72–74).  "An exception to the exhaustion requirement may be made '*only if* there is *no opportunity* to obtain redress in state court or if the [state] corrective

---

("Under our decision in *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), exhaustion of state remedies is required as a prerequisite to consideration of each claim sought to be presented in federal habeas.")

process is *so clearly deficient* as to render *futile* any effort to obtain relief.'" *Vittor v. New York State Dep't of Corr. & Cmty. Supervision*, No. 13-CV-3112 KAM, 2014 WL 1922835, at *3 (E.D.N.Y. May 14, 2014) (quoting *Ellman v. Davis*, 42 F.3d 144, 149 (2d Cir. 1994) (emphases and alteration in original)).  "Futility is present when there is a 'complete absence of a mechanism for correction of the alleged unconstitutional violation' or the petitioner is 'precluded by an unconscionable breakdown from using the process that exists.'"  *Jordan v. Bailey*, No. 13 Civ. 7651, 2013 WL 6233889 (S.D.N.Y. Dec. 1, 2013) (quoting *Francis S. v. Stone*, 995 F. Supp. 368, 380 (S.D.N.Y.1998), *aff'd*, 221 F.3d 100 (2d Cir.2000)).

Petitioner's allegations completely misapprehend the current situation in Connecticut State Courts.  The courts are open and are currently hearing and processing inmate requests for release.  Several inmates have already filed actions in state court for habeas relief based on similar claims related to COVID-19 and these claims have and are being acted upon.

Indeed, the ACLU, and a separate Yale Law School clinic, have filed a mandamus action in state court seeking the mass release of thousands of inmates.  *See CCDLA v.Lamont,* Superior Court, Judicial District of Waterbury, Docket No. CV20-6054309-S[10].  Within three weeks, the case was docketed, Respondents filed a motion to dismiss, this motion was argued, and the court (*Bellis, J.*) rendered a decision granting dismissal.  (Exhibit E.)  *See also, Day, Robert #253376 v. Commissioner of Correction,* Superior Court, Judicial District of Rockville, Docket No. CV17-4008971-S[11] where within seven (7) days the petitioner's habeas motion was filed, objected to, and the presiding habeas judge (*Bhatt, J.*) rendered a decision.  (Exhibit F.) Petitioners in that action then filed an application for leave to file a public interest appeal with

---

[10] Petitioners have asserted a public interest appeal which has been accepted by the CT Supreme Court. *Connecticut Criminal Defense Lawyers Assoc. v. Ned Lamont, et al*, SC 190295.
[11] http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=TSRCV174008971S; a copy of Judge Bhatt's Ruling is attached hereto, for the convenience of the Court.

the Connecticut Supreme Court, that court accepted the appeal, and a briefing schedule has been set for the parties. See *CCDLA v. Lamont*, No. SC 190295.[12]

As for the state habeas courts, they have been in operation and effectively ruling on habeas cases filed with lightning speed. Although the Rockville courthouse where state habeas cases are normally handled was closed as of March 30, the habeas mail was forwarded to the Hartford Superior courthouse. (Exhibit G, Stackpole Dec., at 1, ¶¶2-4.) Assistant clerk Stackpole as early as April 3 arranged for mail to be opened to review them for emergency and urgent claims. *Id*., ¶5. If any properly drafted petitions were of an emergency status they were sent to the judge for review. *Id.* at 2, ¶6. Two such claims were *Robert Day, supra* and *Jeffrey Grimes v. Commissioner of Correction*, Superior Court, Judicial District of Tolland, TSR-CV20-5000478-S. Both cases were already docketed but had amended motions for release due to the COVID-19 pandemic which were filed, objected to, and ruled on within two (2) weeks. *Id.*, ¶¶7-8. As of April 15, 2020, new procedures were set up to open, scan, review, and docket new habeas emergency cases in Hartford. *Id.*, ¶¶10-11. Three additional cases were processed in this manner with the Public Safety Department of the Attorney General's Office receiving email copies of the new actions so they could expedite appearances and review. Those cases were: *Solomon Boyd v. Commissioner of Correction*, HHD-CV20-5063875; *Douglas Murphy v. Commissioner of Correction*, HHD-CV20-5063876; and *Malik Nunn v. Commissioner of Correction*, HHD-CV20-5066377. *Id.* at 2-3, ¶¶12-13. In *Malik Nunn v. Commissioner of Correction*, HHD-CV20-5066377 the case has already been heard by the Hon. Judge Kwak, with *Solomon Boyd v. Commissioner of Correction*, HHD-CV20-5063875; *Douglas Murphy v. Commissioner of Correction*, HHD-CV20-5063876 scheduled for hearings on Monday May 18,

---

[12] *The online docket is available at Jud.Ct.Gov.*

2020. *Id*. at 5, ¶¶26-27.  Two other cases; *Madeline Griffin v. Commissioner of Correction*, TSR-CV17-4009012 and *Jose Rivera v. Commissioner of Correction*, TSR-CV20-50000561 have been opened and are currently in the pleading stages. *Id*. at 3-4, ¶¶16, 20.  Since the pandemic began through May 8, 2020 68 new habeas petitions have been filed. *Id*., ¶17.  Eight petitions that failed to comply with the practice book were returned, 10 are not COVID related and are currently under review. *Id.*, at 3-4 ¶17.   The remaining 50 petitions were docketed. *Id*., ¶18.  Of those 50, 16 were conditions of confinement cases and 34 challenged underlying convictions thus not related to COVID-19 in any way. *Id*., ¶18.  In that time only four (4) new petitions have been COVID-19 related. *Id*. at 4, ¶19.   The Petitioner Marcus Hurdle has not filed a state habeas petition. *Id*. at 5, ¶32.

Inmates like Petitioner not only have access to the courts to bring actions seeking their release, the courts have accommodated inmates by instituting procedures to process habeas petitions despite the pandemic closing certain courthouses.  All the Petitioner had to do was actually engage the process.  Petitioners claims of futility amount to a few phone calls to his criminal attorney and the court regarding bond reduction[13] and an assumption a habeas filing would not work. Once again it should be remembered that Petitioner is a lawfully sentenced inmate who still has open, pending criminal charges that sre the subject of ongoing Superior Court proceedings.  Even if his bond were reduced, he would still need habeas relief regarding his current sentence.

As shown above, the state habeas court has instituted a particularly speedy litigation schedule wherein claims due to COVID-19 are heard by the court promptly.  Petitioner's claim

---

[13] See Petitioner's Declaration of Molly Petchenik at 2 (ECF #17-4) and Declaration of Lori Esposito (ECF #17-2.) at 3, 18, where Petitioner currently has a court date for June 9, 2020 for bond hearing which coincides with his next criminal hearing date.

of futility is a material misrepresentation of the prompt and expeditious treatment of such matters seeking emergency release or emergency reductions in bond, that the courts are providing in response to such emergency motions. *See Money v. Pritzker,* 2020 WL 1820660 at *22, (N.D. Ill., April 10, 2020) ("To be sure, exhaustion requirements can…be waived when relief is truly unavailable. But waiving them here—when state courts clearly were available …would turn the habeas system upside down."). As well, it is entirely untenable for the Petitioner to claim the process is futile without even attempting to engage the process in the first place.

### iii.   The current COVID-19 pandemic is no excuse for failing to exhaust

Petitioner goes into great length to describe the current COVID-19 pandemic and the extraordinary circumstances the state, the prisons, and, in particular, the Petitioner find themselves. (Amend. Pet. for Writ. at 7-10.) And, while in no way do the Respondents mean to minimize the impact of the current pandemic, it is still no excuse for failing to exhaust.

Nationwide inmates are seeking release through several methods both in state and federal courts. One such method is through compassionate release under 18 U.S.C. § 3582(c)(1)(A). Like § 2254, § 3582 has an exhaustion requirement[14]. Despite the exigency alleged due to the current crisis, courts are not excusing the statutory exhaustion requirement. In *United States v. Raia*, 954 F.3d 594 (3rd Cir. 2020) the 3rd Circuit confirmed the petitioner's lack of exhaustion as being fatal to his motion for release. Even with due consideration to the present situation the Court held "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread…Given BOP's shared desire for a safe and healthy prison environment, we conclude that

---

[14] 18 U.S.C. § 3582(c)(1)(A): "(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant *after the defendant has fully exhausted all administrative rights…"*

strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id*. at 597.

Similarly, in this district a petitioner's failure to exhaust amid COVID-19 concerns is not an excuse. *See United States v. Gamble*, 2020 WL 1955338 at *2-3, (D. Conn., April 23, 2020) wherein the Honorable Vanessa L. Bryant stated "[w]hile the '[c]ommon law (or 'judicial') exhaustion doctrine ... recognizes judicial discretion to employ a broad array of exceptions that allow a plaintiff to bring his case in district court despite his abandonment of the administrative review process,' this array of exceptions—including futility—is simply not available when the exhaustion requirement is statutory." *Theodoropoulos v. I.N.S*., 358 F.3d 162, 172 (2d Cir. 2004) (quoting *Beharry v. Ashcroft*, 329 F.3d 51, 58 (2d Cir. 2003), as amended (July 24, 2003))."

Federal Courts in districts throughout the country have been denying all types of requests for release such as under § 3582 and even under § 2241 when the petitioner has failed to exhaust regardless of the COVID-19 pandemic[15].

---

[15] *See, e.g., Furando v. Ortiz*, 2020 WL 1922357 at *4 (D. NJ, April 21, 2020)(in denying petition for writ of habeas pursuant to § 2241court held "the Court will dismiss the petition without prejudice for failure to exhaust administrative remedies."); *United States v. Cox*, 2020 WL 1923220 at *1, (S.D. Ind., April 21, 2020)("Because Mr. Cox has not exhausted his administrative remedies and the Court cannot waive that requirement, his Motion is denied without prejudice."); *Simmons v. Warden, FCL-Ashland*, 2020 WL 1905289 at *3, (E.D. Ky., April 17, 2020)(" Nor may the Court consider a request for habeas relief where Simmons concedes that he failed to pursue any available administrative remedies, much less fully exhaust those remedies, prior to filing his petition."); *Newton v. Louisiana Dept. of Corrections*, 2020 WL 1869018 at *2, (W.D. La, April 13, 2020)("[I]f Newton seeks to bring this as a habeas action seeking parole, he has not alleged that he exhausted his state court administrative remedies prior to bringing suit."); *United States v. Heath*, 2020 WL 1957916, at *1 (W.D. Okla, April 23, 2020)("Defendant's [f]ailure to comply with [the] mandatory exhaustion requirement [of § 3582(c)(1)(A)] prevents judicial review of the issue (collecting cases); *United States v. Bell*, No. 16-20008-02-DDC, 2020 WL 1923086 at *2 (D. Kan. Apr. 21, 2020) (court lacked jurisdiction over defendant's motion for compassionate release under § 3582(c)(1)(A) based on COVID-19 pandemic due to failure to exhaust administrative remedies where defendant filed motion just one week after he filed a request with the warden, had not yet received warden's response, and 30 days had not elapsed since he submitted the request to the warden); *United States v. Gonzalez*, No. 18-cr-00130-PAB, 2020 WL 1905071 at *2-3 (D. Colo. Apr. 17, 2020) (the judiciary lacks "power to craft an exception" to § 3582(c)(1)(A)'s exhaustion requirement and because defendant's motion failed to indicate warden had responded to administrative request or that 30 days had lapsed from the warden's receipt of such request, motion had to be dismissed for lack of jurisdiction);

### iv.   Even if this Court Considers Petitioner's Claims under § 2241 his claims are still barred for failing to exhaust

Should this Court consider the Petitioner's claims under his pre-trial detainee status, before seeking § 2241 habeas corpus relief, however, he still must first exhaust available state-court remedies. *See United States ex rel. Scranton*, 532 F.2d at 294.  "The exhaustion doctrine is a judicially crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a swift and imperative remedy in all cases of illegal restraint or confinement."  *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 490 (1973) (internal marks and citation omitted).  "This exhaustion requirement is also grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."  *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).  It exists, "in recognition of the fact that the public good requires that those relations [between the States and the Union] be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the constitution."  *Ex parte Royall*, 117 U.S. 241, 251 (1886).

"The distinction between s 2241, pre-trial exhaustion, and s 2254, post-trial exhaustion, is recognized and discussed in Justice Rehnquist's dissent in [*Braden*].  For our purposes, it is sufficient to recognize that, although there is a distinction in the statutory language of ss 2254 and 2241, there is no distinction insofar as the exhaustion requirement is concerned."  *Moore v. DeYoung*, 515 F.2d 437, 442  (3d Cir. 1975); *see also Thomas v. Crosby*, 371 F.3d 782, 812

---

*United States v. Perry*, No. 18-cr-00480-PAB, 2020 WL 1676773 at *1 (D. Colo. Apr. 3, 2020) (finding court lacked jurisdiction over the defendant's request for compassionate release under § 3582(c)(1)(A) based on COVID-19 pandemic where he did not satisfy exhaustion requirement and defendant failed to identify any "Tenth Circuit case where [a futility or an irreparable harm] exception to an exhaustion requirement has been found in a factually analogous case").

(11th Cir. 2004) ("Among the most fundamental common law requirements of § 2241 is that petitioners must first exhaust their state court remedies.").

As argued *supra,* there are no factual allegations or evidence appended to Petitioner's moving papers to show that the Petitioner has even initiated, let alone fully exhausted, his state court remedies.  Further, Petitioner has not proposed any valid excuse for his failure to exhaust. As such, even if this Court were to view the Petitioner's claims as a pre-trial detainee pursuant to § 2241, they are still barred due to their failure to fully exhaust their State Court remedies.

> **b.  Petitioner Cannot Make a Substantial Showing of Likelihood of Success on the Merits as is Required for a Mandatory Injunction as There is no Eighth Amendment Violation, no Fourteenth Amendment Violation and no ADA Violation**

"In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846– 47 (1994)) (other citations omitted).  "A party moving for a mandatory injunction that alters the status quo by commanding a positive act must meet a higher standard, however. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995). That is, in addition to demonstrating irreparable harm, '[t]he moving party must make a clear or substantial showing of a likelihood of success' on the merits, *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996) (internal quotation marks omitted), a standard especially appropriate when a preliminary injunction is sought against government. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir.2006)." *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006), opinion amended on denial of reh'g, 480 F.3d 138 (2d Cir. 2007).  "A mandatory injunction, like a mandamus, is an extraordinary remedial process, which is granted, not as a matter of right, but in

the exercise of a sound judicial discretion.  It issues to remedy a wrong, not to promote one."

*Morrison v. Work*, 266 U.S. 481, 490 (1925)[16].

### i.  TRO Standard and higher burden for mandatory injunction

"A motion for a temporary restraining order is governed by the same standards as a

motion for a preliminary injunction."  *Id.* (citing *Local 1814, Int'l Longshoremen's Ass'n v. New

York Shipping Ass'n*, 965 F.2d 1224, 1228 (2d Cir.1992)).  "A party seeking injunctive relief

ordinarily must show: (a) that it will suffer irreparable harm in the absence of an injunction and

(b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to

the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly

in the movant's favor."  *Tom Doherty Assoc., Inc., v. Saban Entertainment, Inc.,* 60 f3d 27, 33

(2nd Cir 1995.  The Second Circuit has cautioned that preliminary injunctive relief "is an

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear

showing, carries the burden of persuasion." *Moore v. Consolidated Edison Co. of New York, Inc.,*

409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks and citation omitted).

"[W]here an injunction is mandatory—that is, where its terms would alter, rather than

preserve, the status quo by commanding some positive act…the moving party must meet a

higher standard than in the ordinary case by showing "clearly" that he or she is entitled to relief

---

[16]*See e.g., DeAngelis v. Ashraf,* No. 3:18-CV-1689 (MPS), 2019 WL 2453766, at *1 (D. Conn. June 12,
2019). ("[p]reliminary injunctive relief is an extraordinary remedy and is never awarded as a matter of
right. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Johnson v. Newport Lorillard*, No.
01-Civ-9587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003)."); *Buffalo Forge Co. v. Ampco–
Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981) (quoting Medical Society of New York v. Toia, 560
F.2d 535, 538 (2d Cir.1977)). ("[I]nterim injunctive relief is an 'extraordinary and drastic remedy which
should not be routinely granted.'"); *Vega v. Lantz*, No. 3:04-CV-1215(DFM), 2005 WL 1802145, at *1
(D. Conn. July 27, 2005), aff'd, 173 F. App'x 74 (2d Cir. 2006) ("In addition, a federal court should grant
injunctive relief against a state or municipal official 'only in situations of most compelling necessity.'
*Vorbeck v. McNeal*, 407 F. Supp. 733, 739 (E.D.Mo.), aff'd, 426 U.S. 943, 96 S.Ct. 3160, 49 L.Ed.2d
1180 (1976).").

or that "extreme or very serious damage" will result from a denial of the injunction." *Philip v. Fairfield University*, 1158 f3d 131, 133 (2nd Cir 1997).  Additionally, "we have required the movant to meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."  *Tom Doherty* at 33-34.

Mandatory injunctions "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 406 (2d Cir. 2011).  A party seeking a mandatory injunction must make a "substantial showing of a likelihood of success" on the merits. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

The Petitioner is clearly requesting a mandatory injunction.  Their Motion for a temporary restraining order (ECF #16) demands Petitioner's immediate release.  *See also*, Amend Pet for Writ at 23 "order his release from custody."; Memo of Law ISO TRO at 42, "issue a temporary restraining order granting his immediate release."  Petitioner at all stages of this litigation has requested his immediate release and granting it would give him all the relief he requests and is inapposite to maintaining the status quo.

### ii.   The Petitioner cannot make a substantial showing of likelihood of success on the merits as there is no Eighth Amendment violation

 "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety…a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions…Whether one puts it in terms of duty

or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). (internal citations and quotation marks omitted.)

"[A]lthough accidental or inadvertent failure to provide adequate medical care to a prisoner would not violate the Eighth Amendment, "deliberate indifference to serious medical needs of prisoners" violates the Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling V. McKinney*, 509 U.S. 25, 32 (1993) quoting *Estelle v. Gamble*, 429 U.S.97, 104 (1976).

"[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer* at 847.

A corrections official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.  "[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment…a prisoner advancing such a claim must, at a minimum, allege deliberate indifference to his serious medical needs…It is *only* such indifference that can violate the Eighth Amendment… allegations of  inadvertent failure to provide adequate medical care or of a "negligent ... diagnos[is]…simply fail to establish the requisite culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (Emphasis in original) (Internal citations and quotation marks omitted.)

In the present case, and has been said multiple times above, the Respondents do not challenge that the COVID-19 pandemic currently facing the country is not a serious medical crisis.  And, it is also true the Respondents are aware of the crisis and the need to address it. However, this is where the analysis sharply differs from the Petitioners.  As is pointed out in great detail in the factual section of this memorandum, and in the declaration of Dr. Byron Kennedy, the DOC and the individual wardens have done extensive work to mitigate the spread and impact of the COVID-19 pandemic into individual facilities.  To indicate anything to the contrary severely belittles the extraordinary work put in by DOC officials and the individual staff members.  While DOC officials are clearly aware of the pandemic, they have taken extraordinary measures to mitigate the impact.  All the measures taken by the DOC are clearly reasonable in light of the current situation.  The facts of this case clearly demonstrate not only that is there no deliberate indifference by the Respondents themselves, but that DOC officials have done everything with an eye towards protecting the health and safety of those in their charge.

At best, the record can be read to show some disagreement as to whether the measures taken by the DOC are what the Petitioner would want.  *See Valentine v. Collier*, ___, F.3d, ___, 2020 WL 1934431, at \*4 (5th Cir. April 22, 2020) "Although the district court might do things differently, mere "disagreement" with TDCJ's medical decisions does not establish deliberate indifference."  Even if proven, that claim would amount at best to negligence.  "[I]n order to show deliberate indifference, a plaintiff must show something more than mere negligence." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).  In no way does that consitute a substantial showing that the Respondents were reckless or otherwise deliberately indifferent to the Petitioner's serious medical needs.

### iii.  The Petitioner cannot make a substantial showing of likelihood of success on the merits as there is no Fourteenth Amendment violation

Although the Petitioner is clearly a lawfully incarcerated inmate currently serving his sentence at CCI, he is also considered a pre-trial detainee awaiting judgment and sentencing on other charges.  As noted above, however, the fact that the Petitioner is facing several criminal charges does nothing to change the state of his incarceration—he is a convicted state inmate and will remain so for another two years.  Accordingly, it would be odd to say the least to review any of his claims solely under a Fourteenth Amendment analysis as, even if he could prove a violation, he is still subject to the more rigorous standard under the Eighth Amendment analysis discussed above.  However, even under a Fourteenth Amendment analysis his claims would still fail.

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment."  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2nd Cir. 2017).   "[A] pretrial detainee must satisfy two prongs to prove a claim, an "objective prong" showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a "subjective prong"—perhaps better classified as a "mens rea prong" or "mental element prong"—showing that the officer acted with at least deliberate indifference to the challenged conditions."  *Id.*   "A plaintiff can prove deliberate indifference by showing that the defendant official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to [the plaintiff's] health or safety."  *Charles v. Orange County*, 925 F.3d 73, 87 (2nd Cir. 2019). (emphasis in original).

"Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Darnell* at 30. "The conditions themselves must be evaluated in light of contemporary standards of decency." *Blissett v. Coughlin*, 66 F.3d 531, 537 (2nd Cir. 1995), quoting *Rhodes v. Chapman*, 452 U.S. 337, 346, (1981).

"A plaintiff must show "something more than mere negligence" to establish deliberate indifference in the Fourteenth Amendment context." *Charles v. Orange County, supra* at 87, *quoting Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).

Here, as noted above in the factual background section, the Respondents have taken substantial, reasonable steps to mitigate the risks of COVID-19 not only to the Petitioner but to the greater prison population at large.  Currently, the total prison population has been decreased by 15%.  Further, they have implemented increased sanitization of the common areas and the living areas of the inmates.  Staff and inmates alike are required to wear masks and social distancing measures have been instituted.  Soap and other cleaning products and disinfectants are routinely distributed.  The Respondents have clearly taken more than reasonable steps to mitigate the risk to inmates in consideration of the current pandemic.  Therefore, the Petitioner cannot make a substantial showing of likelihood of success as to any Fourteenth amendment violation.

### iv.   The Petitioner cannot make a substantial showing of likelihood of success on the merits as there is no ADA violation

Title II of the ADA prohibits public entities from discriminating against qualified individuals with disabilities by depriving them of opportunity to participate in the services, programs, or activities of the public entity because of their disabilities. 42 U.S.C. § 12132. Title II of the ADA applies to prisons, as "[s]tate prisons fall squarely within the statutory definition

of "public entity" under the ADA. Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998).

In order to establish a prima facie violation under Title II of the ADA, Petitioner must show "1) he is a qualified individual with a disability; 2) DOC is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from DOC's services, programs, or activities or DOC otherwise discriminated against him by reason of his disability." Wright v. New York Dept. of Corrections, 831 F.3d 64, 72 (2nd Cir, 2016).  A qualified individual can base a discrimination claim on any of "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord,* 591 F.3d 37, 43 (2nd Cir. 2009).  "The ADA requires only that a particular service provided to some not be denied to disabled people." *Rodriguez v. City of N.Y.*, 197 F.3d 611, 618 (2d Cir.1999).

There are no allegations which would provide facts to support a claim under the theory of intentional discrimination nor could there be.  Nor has the Petitioner alleged that he was denied one of the release mechanisms due to his disability.  The Petitioner would be equally unavailing under the second theory of disparate impact.  There are no allegations indicating that the discretionary decisions of the Respondents during this crisis have had a disproportionate impact on disabled inmates.

Petitioner appears to be making his claim under the theory of failure to make a reasonable accommodation to him in consideration of his disability in stating "Respondents are statutorily required to accommodate Mr. Hurdle's disability."  Memo ISO TRO at 19.  Petitioner further alleges that he lacks "access to mental health care services that he requires."  *Id*.  However, from the Petitioner's own declaration it appears that he has never received the mental health treatment

he now claims to need.  "Each time I was sent to prison it interrupted any progress I made in managing my mental health.  I received no treatment in prison and the courts did not understand the role PTSD and trauma played in my behavior."  Hurdle Decl. ¶17.  Further, facility medical records of the Petitioner indicate that he has been reviewed for mental health treatment and he has denied needing them.  He has educated on how to request mental health treatment but has made no requests for mental health treatment since the onset of the pandemic.  *See* Exhibit D, Freston Dec., ¶¶8-9.  There is no allegation either in his declaration or elsewhere in the pleadings that he requested treatment and it was denied.  A general suspension of certain types of mental health treatments facility wide as a result of the COVID-19 pandemic do not in any way provide facts that a reasonable accommodation has been denied this Petitioner.  In fact, the relevant documents show this Petitioner himself refused the need for mental health treatment that has been offered to him.  *Id*., ¶¶15-16

The Petitioner has not produced sufficient facts to show any violation of the ADA. Petitioner, prior to the pandemic, refused mental health treatment when offered to him and educated on how to request treatment should it be necessary in the future.  Since the beginning of the pandemic the Petitioner has not requested mental health treatment, nor is there any allegation that it was requested and refused.  At best the Petitioner alleges that, in general, the normal mental health group programming was suspended.  There has been no violation under the ADA.

As the Petitioner cannot make a substantial showing of likelihood of success on the merits of any of his claims, he has not satisfied the requirements for a TRO and his case should be dismissed.

**v.  The Petitioner cannot make a showing of Irreparable harm as any alleged harm is too speculative**

"Although a showing that irreparable injury will be suffered before a decision on the merits may be reached is insufficient by itself to require the granting of a preliminary injunction, it is nevertheless the most significant condition that must be demonstrated." *Cerilli v. Rell,* 2010 WL 1330998, at *2 (CT, March 31, 2010) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985)).  "To demonstrate irreparable harm, plaintiff must show an 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *Id*. (quoting *Forest City Daly Housing, Inc*., 175 F.3d at 153).

In the Second Circuit, a "showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted). That harm must be "actual and imminent" rather than speculative. *Id*.

Although Petitioners go into great length to describe the grave nature of the current COVID-19 pandemic, the question of speculative versus imminent is still relevant.  The Respondents have never taken the position, and do not now, that the pandemic is anything less than a significant medical crisis.  Petitioner assumes that he is at grave risk of exposure to COVID-19.  But fear of the virus is not sufficient.  There are insufficient facts to show that the DOC is unable to properly manage the current challenges posed by the virus.

Per the US Census the State of Connecticut has approximately 3,565,287 residents[17].  As of the most recent day of reporting (May 18, 2020) in Connecticut there are 38,116 reported COVID-19 positive cases with 3,449 COVID-19 associated deaths[18].   That relates to a 1%

---

[17] https://www.census.gov/quickfacts/CT
[18] https://portal.ct.gov/coronavirus

positive infection rate with a mortality rate of 9% of those infected.   As of May 18, 2020, the

total population of DOC facilities stands at 10,554[19].   As of May 15, 2020, the DOC reports 598

total inmates have been positive for COVID-19 with 6 COVID-19 related deaths[20].   That relates

to an approximately 5.6% infection rate but just a 1% mortality rate.   So, when comparing the

DOC to the community, while there is a greater infection rate, there is a significantly lower

mortality rate.   Of the 598 total COVID-19 positive inmates, only 17 have come from CCI where

the Petitioner is housed.   According to the tracker 444 inmates who have contracted the COVID-

19 have recovered and returned to their original facility.   This translates to a 75% recovery rate.

There are insufficient facts to suggest that the Petitioner will suffer irreparable harm.

Although Petitioner continually claims he is of advanced age and has a condition which puts him

at risk, neither of those criteria have been confirmed by the CDC.   He misses the age group

identified by the CDC by 15 years and nowhere does the CDC list PTSD as a risk factor.   And,

while the percentage of contracting COVID-19 is greater in the prison community, it is far less in

the current facility where Petitioner is housed.   In light of the facts that: there is minimal risk of

contracting the virus; he is not in a risk group identified by the CDC; significant measures have

been implemented to, prevent further introduction into the facility and reduce the further spread

of the virus in the facility; any fear of the virus is speculative at best which is not enough to

satisfy the requirements to show irreparable harm.   District courts across the country have held

similarly that fear of COVID-19 is not enough to warrant the release of prisoners[21].

---

[19] https://cjis-dashboard.ct.gov/CJPPD_Reports/rdPage.aspx?rdReport=Extracted_Data
[20] https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories
[21] *See e.g. Riggs v. Louisiana*, 2020 WL 1939168 at *2 (W.D. La, April 22, 2020)("[E]ven if [plaintiff's] claims are properly asserted, whether under § 1983 or habeas, several federal courts have considered arguments like those of Riggs and have universally found that prisoners are not entitled to release or transfer based solely on generalized COVID-19 fears and speculation.");   *United States v. Clark*, 2020 WL 1446895 at *3 (D. Kan. March 25, 2020)(Denial of release pursuant to 18 U.S.C. § 3142(i)); *United States v. Eberhart*, 2020 WL 1450745 at *2 (N.D. Cal. March 25, 2020) (Denial of modification of his

**vi. The balance of the equities and public interest weigh strongly in favor of the Respondents**

"A balance of hardships tipping decidedly toward the party requesting a preliminary injunction means that, as compared to the hardship suffered by other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a 'real hardship.'" *Doe v. Zucker*, No. 117CV1005GTSCFH, 2019 WL 111020, at *6 (N.D.N.Y. Jan. 4, 2019) (emphasis added) (quotation omitted). "'A balance of equities tipping in favor of the party requesting a preliminary injunction' means a balance of the hardships against the benefits." Id. (citing *Ligon v. City of New York*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities"); *see also Jones v. Nat'l Conference of Bar Examiners*, 801 F. Supp. 2d 270, 291 (D. Vt. 2011) (considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the equities).

"[A] preliminary injunction is 'in the public interest' if the preliminary injunction would not 'cause harm to the public interest.'" *Doe*, 2019 WL 111020, at *7 (quoting *SEC v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012). "The 'public interest' is defined as '[t]he general welfare of the public that warrants recognition and protection,' and/or

---

sentence under the compassionate release provision of 18 U.S.C. § 3582(c)(1)(A)(i)); *Carter v. Santa Fe Adult Det. Ctr.*, No. CV 20-00271 RB/GJF, 2020 WL 1550888 (D.N.M. Apr. 1, 2020). (denial of Emergency Injunction); *United States v. Santana*, No. 1:19-CR-251, 2020 WL 1692010 (M.D. Pa. Apr. 7, 2020) (asthmatic prisoner with sleep apnea denied temporary release); *United States v. Williams*, Crim. No. PWG-19-8, 2020 WL 1643662, at *2 (D. Md. Apr. 2, 2020) (denying defendant's motion for release from facility where five detainees tested positive for COVID-19 and defendant suffered from allergies and asthma); *United States v. Teon Jefferson*, Crim. No. CCB-19-487, 2020 WL 1332011 (D. Md. Mar. 23, 2020) (denying asthmatic defendant's motion for release due to COVID-19 outbreak).

'[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation.'" *Id*. (quoting Black's Law Dictionary at 1350 (9th ed. 2009)).

First, it is very clear from the Petitioner's criminal history that he is a serious threat to the public should he be released.  The public has a definite interest in keeping violent criminals off the streets.   Petitioner is also currently facing significant time should he be convicted and sentenced on his pending charges.  The State has a significant interest in making sure he appears for his next court date.  Respondents understand they have a duty to the inmate population, but they also have a duty to every citizen of the State of Connecticut to protect public safety.

At first glance, an order releasing Petitioner from confinement seems beneficial to him. However, based on the available numbers, the risk of mortality for those who test positive in the community is eight times greater than within DOC.  The proposed plan for release has the Petitioner being maintained in a home with someone who has been the victim of his domestic abuse[22].  With Petitioner's history of domestic abuse, coupled with repeated failures to comply with orders of the court and conditions of parole, neither of those plans are remotely feasible. Petitioner cannot simply argue that the Court has "broad" ability to fashion a remedy, ask for release and leave all of the practical issues of where and with whom to house the inmates to this Court.  He is seeking a mandatory injunction and carries a heavy burden.

For all these reasons, Petitioner has not met his heavy burden to demonstrate the equities weigh in his favor and that the public interest would be best served by granting his Motion. Therefore, this Court must deny Petitioner's request.

---

[22] See Amend. Pet. for Writ, prayer for relief, ¶c); see also Galligan Dec, at 7, ¶39

### c. The PLRA Bars this Court from ordering the relief sought by the Petitioner

"Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987).

Federal courts may order prospective relief "in any civil action with respect to prison conditions," provided the relief "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A).  Should this court deem such relief necessary it must be narrowly tailored or proportional to the scope of the violation and extending no further than necessary to remedy the violation. *Brown v. Plata*, 563 U.S. 493, 530 (2011). A court should not issue "remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution." *Id*.

Petitioner requests habeas relief and his immediate release. However, the PLRA, 18 U.S.C. § 3626, titled "Appropriate remedies with respect to prison conditions," places strict limits on Courts' ability to order the release of inmates "in any civil action with respect to prison conditions," and precludes a single district judge from doing so.  *Id.* § 3626(a)(3)(A)-(B). That law applies to "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." *Id.* § 3626(g)(2).

In such a suit, the Court "may enter a temporary restraining order or an order for preliminary injunctive relief," but such injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the

least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Under Section 3626, a "prisoner release order"—which "includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison," 18 U.S.C. § 3626(g)(4)—may "be entered only by a three-judge court," *id.* § 3626(a)(3)(B), and then only if certain conditions have been met.

Among other requirements, "no court shall enter a prisoner release order unless—(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders." *Id.* §3626(a)(3)(A).

Congress enacted the PLRA "to oust the federal judiciary from day-to-day prison management." *Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997); *see also Benjamin v. Jacobson*, 172 F.3d 144, 182 (2d Cir. 1999) (*en banc*) (Calabresi, J., concurring) ("The *in banc* majority argues at length that Congress meant to get the federal courts out of the business of running jails, and it cites any number of congressional statements to that effect."). "Congress intended the PLRA to revive the hands-off doctrine," which was "a rule of judicial quiescence derived from federalism and separation of powers concerns." *Gilmore v. California*, 220 F.3d 987, 991, 997 (9th Cir. 2000). "Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Section 3626 thus "restrict[s] the equity jurisdiction of federal courts," *Gilmore*, 220 F.3d at 999

34

Section 3626 prevents this Court from granting Petitioner's requested relief.  Under Section 3626, "[t]he authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court, not a single-judge district court." *Plata*, 563 U.S. at 500 (citing 18 U.S.C. § 3626(a)); 18 U.S.C. § 3626(a)(3)(B) ("In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court.").

Moreover, such an order may not be entered unless "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A).

One court recently reached this conclusion in an identical case. In *Money v. Pritzker*, Nos. 20- CV-2093 & 20-CV-2094, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), inmates from various Illinois Department of Correction facilities brought purported class action lawsuits seeking release of prisoners over 12,000 prisoners in light of the COVID-19 pandemic. The Court held that the PLRA prevented it from entering the relief requested by Petitioners for the release of inmates.  *Id.* at, *14; *see also Jones v. Smith*, 720 F.3d at 145, n. 3 (assuming that the PLRA applies to conditions of confinement habeas claims brought under Section 2241).

Clearly, release of inmates is one of the least narrowly drawn and most intrusive means imaginable.  Thus, Petitioner's requested relief is barred by statute.  *See* 18 U.S.C. § 3626(a)(2) (any preliminary injunction must "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."; *see also Jones v. Smith*, 720 F.3d 142, 145 n. 3 (2d Cir. 2013) (assuming that the PLRA applies to conditions of confinement claims brought under Section 2241). Even if

Petitioner could somehow show a substantial likelihood of irreparable harm and success on the merits, his requested relief is barred, meaning a mandatory injunction cannot issue.

**IV.     <u>CONCLUSION</u>**

For all the foregoing reasons the Respondents object to the Petitioner's Motion for Temporary Restraining Order, as well as, his Petition for Writ of Habeas Corpus.

RESPONDENTS,
ROLLIN COOK, *et al*,

WILLIAM TONG
ATTORNEY GENERAL

BY:___/s/ *James W. Donohue*_____
     James W. Donohue
     Assistant Attorney General
     110 Sherman Street
     Hartford, CT  06105
     Federal Bar #ct28566
     E-Mail:  james.donohue@ct.gov
     Tel: (860) 808-5450
     Fax: (860) 808-5591

## **CERTIFICATION**

I hereby certify that on May 19, 2020 a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

                 /s/ *James W. Donohue*
                 James W. Donohue
                 Assistant Attorney General